Filed 8/1/23  Estate of Runnells  CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ESTATE OF CLAUDIA MARIE RUNNELLS, Deceased. | |
| | G061141 |
| CAROL J. CHAMBERLAIN, | (Super. Ct. No. 30-2019-01085334) |
| Petitioner and Respondent, | O P I N I O N |
| v. | |
| THOMAS A. SWANNER, | |
| Contestant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, David L. Belz, Judge.  Affirmed.

Bohm Wildish & Matsen, James G. Bohm and Nicholas P. Carrigan for Contestant and Appellant.

Prenovost, Normandin, Dawe & Rocha and Tom R. Normandin for Petitioner and Respondent.

*          *          *

After a probate court trial spanning more than two weeks, Thomas Swanner appeals from an adverse judgment on his petitions in which he challenged his mother's estate plan by contending his sister, Carol Chamberlain, exerted undue influence over her. Their mother, Claudia Runnells, made changes to her will and trust in 2014 and 2015 before she passed away in June 2019 at the age of 94. Swanner does not challenge the trial court's decision which rejected his contention that Runnells lacked the requisite mental capacity to make the changes.

As we discuss, substantial evidence supports the probate court's decision against Swanner on his undue influence claim, including the testimony of Runnells's attorneys, her longstanding physician, and the director of her residential living facility, as well as Runnells's own contemporaneous notes and other documentary evidence. The witnesses who regularly interacted with Runnells described her as "spirited," "clear as a bell," and, in rejecting Swanner's claim of undue influence by Chamberlain, opined she was, "actually, quite the opposite." The court heard from 14 witnesses over the course of the trial and reviewed the voluminous exhibits introduced by the parties.

We find no basis for reversal in Swanner's contentions that the court (1) used the wrong legal test in determining whether a presumption of undue influence applied; (2) failed to consider all the relevant factors in assessing undue influence; and erred in (3) concluding Runnells was not at risk of undue influence. The court also acted within its discretion in its evidentiary rulings, including excluding a neurological report Runnells's attorney sent to Runnells by way of Chamberlain. We therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Beginning on September 1, 2021, the trial court heard evidence on four related probate petitions: (1) Chamberlain's July 2019 petition to probate Runnells's will; (2) Swanner's September 2019 petition "to Determine the Construction, Validity, Ascertainment of Beneficiaries and to Determine Title To and Order Transfer of Real Property"; (3) Swanner's October 2019 petition "for Will Contest and Trust Contest and Grounds of Opposition to Probate of Purported Will"; and (4) Swanner's February 2021 petition "for Probate of Will."

In late October 2021, the court took the matter under submission. It issued its tentative statement of decision, considered and overruled Swanner's objections to the tentative decision, and issued its final statement of decision and judgment in December 2021.[1]

The court noted in its statement of decision (SOD) that the case was "factually intensive," and "took detailed notes during the trial and has reviewed the key testimony of the witnesses and documentary evidence." The court's statement of decision is 35 pages long.

As to undue influence, the court "considered the issue of whether [Claudia's pour-over] will and trust were the product of undue influence even if [as the court found] Claudia had the requisite mental competence to understand and appreciate" the changes she made to her estate plan.

The court highlighted certain factors in its decision, including "the history of the relationship between Claudia and Thomas," which the court found "reveals

---

[1] Like the trial court, for ease of reference we will sometimes refer to the parties and other individuals in the litigation by their first names—thus, Swanner as Thomas, Chamberlain as Carol, Runnells as Claudia, Swanner's wife as Cathy (or Kathy), and Thomas and Carol's stepsibling as Raeleen. Raeleen, as noted in Claudia's trust, was provided for outside of the trust during Claudia's lifetime. We mean no disrespect.

numerous ups and downs going back to 1998 and possibly earlier." The court observed the "complex and convoluted real estate transactions between Thomas and Claudia made their relationship even more complicated." Those transactions included Swanner's acquisition of multiple properties over the years in which he was the seller's real estate agent but obfuscated that he was the true buyer, by purchasing the homes "from lenders under [Claudia]'s names as [Thomas] could not go on title as [the] listing agent."

Two properties purchased in this manner were "rental house[s]," one on Gaviota Avenue in Long Beach (the Gaviota rental or Gaviota) in 1984, and the other on Dunrobin Avenue in Lakewood (the Dunrobin rental or Dunrobin) in 1986. Runnells worried over the years that Swanner was a '"con artist,"' and that, as she told her estate planning attorney, the title arrangement '"was being done to defraud people"' with Swanner "trying to hide properties either from the IRS or other creditors." The court observed "the [true] nature of the transactions on [such] investments" was obscure but found there were "apparent ethical and legal issues that resulted in an IRS lien" in tax proceedings against Swanner. Swanner himself characterized the issue as "my big perjury lie to the IRS." The court also found that, while Swanner claimed he paid for the Dunrobin property, "No documentation referencing that payoff was provided in the trial of this case."

The court summarized several "Key Exhibits," including an August 1998 letter Runnells wrote to Swanner discussing various rental property investments. She told him that as part of her estate planning, she was considering forgiving more than $60,000 he owed her at the time, and she noted, '"I have not done anything for Rae or Carol like I have done for you."'

In another August 1998 letter, Runnells referenced her longtime residence on Fanwood Avenue in Long Beach (Fanwood), which she moved into in 1954; she also mentioned "Harold," whom she married in the late 1970's after divorcing Swanner and Chamberlain's father years earlier. Runnells stated in the letter that Swanner "did not

4

support her when she needed it during the time she was splitting with Harold" and further told Swanner in the letter that "Carol will inherit Fanwood and [your] debt . . . will be forgiven in her will."

The trial court noted Runnells used "some very harsh language" in the letter, "describ[ing] Thomas as a 'con artist' and . . . 'selfish and greedy.'" "The court considered this exhibit for [a] historical record of Claudia's state of mind and belief that Thomas owed [her] money from prior real estate transactions between them."

In another letter to Runnells "relating to the ongoing discussions between Claudia and Thomas on how to handle the property and debt issues," Swanner wrote in May 1999 that "'it is ok with me to not be in your will.'" The court noted, "Thomas also says he would like first right of refusal to buy Fanwood if Claudia's heirs or Claudia herself decide to sell it." The court interpreted the letter as stating that "Thomas is acknowledging his awareness that Claudia was not intending to will Fanwood to him."

An undated handwritten letter Claudia sent Thomas further "expresses her distress over property and financial dealings between them. She reveals some strong and negative feelings toward Thomas." "Claudia says," as recounted by the court, "'[B]etween Hal and you and your pettiness to me after all I have done for you when you needed help I cannot believe you do this to me.' She goes on to say, 'I am probably one of the most ["]know what I am doing["] persons you know.'" The court observed the letter "reveals what appears to be some longstanding wounds in the [mother] and son relationship."

Still another letter, also undated, demonstrated the relationship between Runnells and Swanner had turned sour: "'[Y]ou have made the choice to sever our relationship so be it. You will one day regret it, but I appreciate what for my health you have done for me.'" We interpret this last comment as a sarcastic jibe at Swanner over his falling out with his mother.

5

A letter in January 2010 struck a different tone. The probate court noted the subject of the letter "is not clear as to what Claudia was referring," but she "does reference Dunrobin" and two other properties, "Eldridge and Olive." She writes, in the court's synopsis, "'Tom keep the balance of the $168,000 and other houses to clean up defects of the properties'"; Runnells "finishes the letter by suggesting they clean up any debt and not have any hard feelings . . . about it for I love you and Kathy [i.e., Swanner's wife] dearly. Love Mom."

The court also summarized what it found were "Key" aspects of many of Runnells's medical records. For example, a "Kaiser Permanente chart note for May 5, 2012," when Runnells was almost 88 years old, "indicate[d] a dementia evaluation was performed." The result of the "mini mental" testing was "unremarkable," with the evaluator finding "normal aging versus dementia"; "Claudia's executive function for activities of normal living" were similarly deemed "unremarkable."

A June 2012 letter Swanner sent Runnells's attorney suggests he was instrumental in prevailing on his mother for Chamberlain to have "control and responsibility of my mother's health directive."

A February 2014 Kaiser chart note indicated that any relationship that had been reestablished between Swanner and Runnells frayed dramatically when "Thomas made a referral request for Claudia to see a psychiatrist." Runnells, at 89 years old, called personally to speak to Kaiser personnel, directing them "to disregard her son's request." She "reported that she is of sound mind and that she was upset with her son," "does not want [him] involved with her medical appointments," and that "her son was upset with her because she moved some money from an account without consulting with him." Further, "Claudia said Thomas verbally assaulted her," and she "was angry with him." She noted "she volunteers at a school and if she had psychiatric issues the school would not allow her to volunteer."

6

Swanner's request nevertheless appears to have resulted in inquiries being made by "Leny Ambruso, an ombudsman at Kaiser" to Runnells's longtime physician. The physician reported "Claudia is not in agreement" with a referral and, in March of that year, the physician provided a letter stating that "Claudia is of sound mind and is capable of making her own decisions."

The record reflects that Runnells deeply resented what she viewed as an attack on her "'sane-mind.'" While Swanner's psychiatric referral request was rebuffed at that time—as were six subsequent conservatorship petitions he filed in the probate court over the next several years, beginning in 2016—the initial referral attempt appears to have crystalized some decisions Runnells had made reference to over the years.

On March 11, 2014, Runnells, as trustee of her revocable living trust, executed grant deeds transferring Gaviota and Dunrobin to Swanner. Also on March 11, 2014, Runnells requested that Swanner provide her with "loan" information for her tax return for loans that her "Lender's Group" had made to him. She told her estate planning attorney she wanted "to gift Fanwood to Carol," "name Carol as trustee, give everything to Carol," but "forgive any further debt that Thomas owed her and bequest to Thomas from the trust the sum of $35,000." Later in the week, she told the attorney she wanted to exclude Swanner from the trust altogether, but she did not immediately act to do so.

Instead, on March 17, 2014, Runnells executed a second amendment to her 1996 Claudia M. Runnells Revocable Trust as Amended and Restated in 2003 (Second Amendment). The amendment, as the trial court observed, "substantially reduced Thomas's share," giving him "a debt forgiveness . . . and gift[ing] him $35,000 in cash."

Then, in October 2015, Runnells executed a third amendment to her trust (Third Amendment), in which according to the trial court, she forgave Thomas's debt to Claudia and reduced "Thomas's share of Claudia's trust assets . . . to nothing."[2]

_____

[2] Swanner explains in his opening brief that, "[i]n terms of quantifying what [he and Chamberlain] each received" under the trust, the changes gave him about

7

On November 5, 2015, almost 20 months after the Second Amendment and around the same time that Runnells made the Third Amendment, Runnells's primary care doctor filled out a physician's report for residential care for her. Her physician checked neither box next to '"Mild Cognitive Impairment"' or '"Dementia,"' and stated '"No"' for all of the following: "Confused/Disoriented, [I]nappropriate Behavior, Wandering Behavior, [S]undowning Behavior, Depressed, Suicidal." On the same form, "Yes" checkmarks preceded the following: "Able to Communicate Needs, Able to Leave Facility Unassisted, Able to Bathe Self, Able to Dress Self, Able to Feed Self, Able to Care for [O]wn Toiletry Needs, Able to Administer Own Prescription Medications[,] Able to Store Own Medications." Runnells's doctor made a note on the form that "Carol Chamberlain was managing Claudia's financial affairs."

The court's SOD reflects that on November 19, 2015, Runnells moved from her Fanwood home in Long Beach "to Bradford Square/Sunrise Villa Bradford in Placentia," where she "first resided in Assisted Living" and then several years later, in March 2019, "moved to Memory Care" before passing away on June 24, 2019.

Runnells's final years were occupied with Swanner litigating repeated challenges to her competency. He filed his first Petition for Appointment of Probate Conservator in February 2016. After interviewing Runnells at Bradford Square, the probate court's investigator recommended against a conservatorship.[3] The probate court

_____

$320,000 less than if Runnells had treated them equally. That is, Chamberlain received Runnells's only remaining property, Fanwood, valued at $550,000, and she also received $260,000 in cash, while Swanner's debt forgiveness was "$168,500 . . . with respect to the Lender's Group loan." Summing these trust assets up totals approximately $980,000, so a half share for Swanner of that figure would be about $490,000—i.e., about $320,000 more than he actually received.

[3]     As the trial court noted in its SOD, a supplemental investigation report had to be prepared "after a phone call from Thomas. In the phone call Thomas stated he wished to continue with his petition for Conservatorship of Claudia because it was unknown to him why his mother chose not to have a relationship with him. He alleged

8

denied the petition. Five more petitions followed; all were unsuccessful. The court in this matter similarly found no merit in Swanner's will and trust contests based on Runnells's alleged mental incapacity.

The court referenced several other exhibits in its SOD, including a March 2014 letter that Runnells sent to Swanner near the time she created the Second Amendment to her trust. She wrote, "'I have been getting my affairs in order so I don't have another stress attack as my doctor recommended,'" adding pointedly, "'and [as] I decided on my own.'" She also referenced her transfer of funds out of a particular account: "'the money at Citibank was mine from F&M and I could do as I pleased with it and I finally did and remove[d] you [being] in charge of it.'" Runnells addressed several aspects of her financial dealings with her son, stating, "'I need to know how much [your] loan is with Lender's Group and when it will be paid off.'" She apparently believed Swanner wanted Dunrobin and Gaviota deeds to remain in her name, but earmarked "'in my trust as your property.'" Runnells, however, decided to move in another direction: "'I am recording a grant deed for Dunrobin and Gaviota'" for Swanner to take title.

In May 2014, to supplement her physician's March 2014 letter confirming her sound mental state at the time she created the Second Amendment, Runnells requested a similar letter from her chiropractor of 14 years. The trial court summarized that letter: "Dr. Birnie says he has always found her to be alert, oriented and cooperative. She never acts confused or absent minded. She is capable of caring for herself. Dr. Birnie saw no mental health issues with Claudia."

Similar evaluations followed throughout the years; in January 2016, the doctor who performed Runnells's carotid artery surgery that month wrote that she "saw no evidence that [Runnells] lacked capacity to make her own decisions," and noted "Claudia had recently moved to assisted living and was happy there," and "Carol

undue influence by his sister . . . has poisoned the mind of Claudia toward him."

9

requested the letter." Runnells's longtime primary care doctor since 1998 wrote that same month: "She has always been of sound mind and it has not changed since then. She can make her own decision regarding medical care and her finances. She shows clarity of mind.'"

The court in its SOD highlighted certain testimony as particularly persuasive on the question of undue influence: "The combined testimony of her lawyers, Fred Muscarella, Esq., and Noah Herbold, Esq., were important to the court in reaching its findings that Claudia was not unduly influenced. Both of her attorneys attested to Claudia's mental capacity to make her own decisions."

Likewise, "[t]he testimony of Rose Calabrese was also very persuasive to the court. As executive director at Sunrise Villa at B[ra]dford, Ms. Calabrese testified that she had regular conversations with Claudia. She said [that] Claudia was very cognizant of everything that she was doing every day, [and] was independent and capable of making her own decisions at the time of the move to Bradford in November of 2015 [which postdated Runnells's Third (and final) Amendment to her trust in October 2015]. Ms. Calabrese also testified that Claudia, not Carol, instructed her and the staff that she did not wish to see Thomas."

The court concluded its summary of the evidence regarding undue influence with this: "Finally, the testimony of Robert Stone [Runnells's estate planning attorney] was compelling to the court. Mr. Stone had multiple conversation[s] with Claudia and did not suspect her mental capacity was diminished such that she could be subject to undue influence. Mr. Stone was asked why Claudia may have preferred one of her children over the others. Mr. Stone's answer was revealing. He responded by saying, 'Claudia got along with her daughter a lot better than she got along with her son.['] And then Mr. Stone added that Claudia told him that her daughter didn't yell at her, her son did; her daughter didn't force her to do things, her son did. Her daughter didn't try to get a conservatorship, her son did."

10

**DISCUSSION**

Whether a will or trust has been procured by undue influence is a question of fact which must be determined based on all of the facts and circumstances. (*Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1355; *In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 734, fn. 11.) Whether a party has made such a showing must be decided in the first instance by the court or jury sitting as the trier of fact, not the appellate court. (E.g., *Estate of Gelonese* (1974) 36 Cal.App.3d 854, 863.)

Swanner does not directly challenge the sufficiency of the evidence to support the probate court's finding against him on his undue influence claim. Such facial challenges are generally an uphill battle given the governing substantial evidence standard of review. Specifically, "the appellate court's power begins and ends with a determination of whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court findings." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.)

"'All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed.'" (9 Witkin, Cal. Procedure (6th ed. 2023) Appeal, § 390, p. 426, quoting *Estate of Teel* (1944) 25 Cal.2d 520, 527.)

After recognizing these rules, Swanner attempts a more nuanced challenge in which he essentially claims the probate court erred in its evaluation of the evidence. He first contends the court approached the evidence in the wrong order because it used the wrong legal test to determine whether a presumption of undue influence applied. Second, he argues the court failed to consider all the relevant factors in assessing undue influence. Third, he asserts the court could not reasonably conclude based on the evidence before it that Runnells was *not* at risk of undue influence. On the last point,

11

Swanner emphasizes certain testimony *he* found persuasive, namely by hired medical professionals opining about Runnells's age and circumstances generally.

As a practical matter, we see little to distinguish Swanner's claims from a more traditional substantial evidence challenge. We nevertheless consider them as he presents them.

In his first argument, Swanner relies on *Estate of Sarabia* (1990) 221 Cal.App.3d 599 (*Sarabia*).[4] The Supreme Court has observed that "a person challenging [a] testamentary instrument," whether a revocable trust or a will, "ordinarily bears the burden of proving undue influence ([Prob. Code,] § 8252)." (*Rice, supra,* 28 Cal.4th at p. 96.) The high court, however, favorably cited *Sarabia* for a common law exception: "The presumption in favor of a will may be neutralized by a presumption that undue influence was brought to bear on the testator. The presumption of undue influence arises only if all of the following elements are shown: (1) the existence of a confidential relationship between the testator and the person alleged to have exerted undue influence; (2) active participation by such person in the actual preparation or execution of the will, such conduct not being of a merely incidental nature; and (3) undue profit accruing to that person by virtue of the will." (*Sarabia*, at p. 605, italics omitted.)

"If this presumption is activated, it shifts to the proponent of the will the burden of producing proof by a preponderance of evidence that the will was not procured by undue influence." (*Sarabia*, *supra*, 221 Cal.App.3d at p. 605.) It remains "for the trier of fact to determine whether the presumption will apply and whether the burden of

---

[4]     We believe *Sarabia* remains good law, although it has been supplemented by subsequent statutory enactments on related grounds, as stated in *Rice v. Clark* (2002) 28 Cal.4th 89, 97 (*Rice*). As we note below, the question of undue influence in the testamentary context remains an amalgam of common law principles and statutory enactments, as expressly acknowledged in Probate Code section 86.

rebutting it has been satisfied." (*Ibid.*) In other words, it is still a factual question, and therefore subject to the substantial evidence review on appeal. (*Ibid.*)

After the issuance of *Sarabia*, but before Runnells made the changes to her estate plan that Swanner now contests, the Legislature supplemented the common law by adding statutory factors related to the question of undue testamentary influence. In particular, the Probate Code incorporates the Welfare and Institutions Code's definition of undue influence: "'Undue influence' has the same meaning as defined in Section 15610.70 of the Welfare and Institutions Code. It is the intent of the Legislature that this section supplement the common law meaning of undue influence without superseding or interfering with the operation of that law." (Prob. Code, § 86.[5])

Consequently, to further set out the context for our analysis, we place a bookmark on *Sarabia* and turn to section 15610.70—as we know the court did because it referenced both *Sarabia* and that statute in its SOD.

Section 15610.70 defines undue influence as "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." (*Id*., subd. (a).) This definition does not significantly depart from the definition developed in the common law of undue influence. (See, e.g., *Rice*, *supra*, 28 Cal.4th at p. 96.)

In determining whether undue influence occurred, the statute directs a court to consider four factors: "(1) [t]he vulnerability of the victim" (§ 15610.70, subd. (a)(1)); "(2) [t]he influencer's apparent authority," which may be evidenced by a fiduciary or family relationship (*id*., subd. (a)(2)); "(3) [t]he actions or tactics used by the influencer," which may include controlling the victim's life, use of affection or coercion, or initiating

---

[5] Because "Welfare and Institutions Code" is more cumbersome than "Probate Code," all further undesignated statutory references are to the Welfare and Institutions Code.

changes in an estate plan, particularly where haste or secrecy is used (*id*., subd. (a)(3)); and "(4) [t]he equity of the result, which includes such factors as economic consequences and "the appropriateness of the change in light of the length and nature of the relationship" (*id*., subd. (a)(4)). Again, the overlap with the common law is evident.

With this in mind, it becomes apparent that there is no merit in Swanner's first challenge on appeal. He argues the probate court made a legal error—specifically, it "Applied the Wrong Test For Determining Whether The Presumption of Undue Influence Should Apply." In Swanner's view, the court in its SOD and final judgment "does not appear to be considering the relevant elements to determine whether or not there should be a shifting of the burden of proof."

Swanner bases his argument on the fact that the court expressly discussed Runnells's vulnerability to undue influence, which *is* a factor under the four-part statutory test for undue influence, but the court did not expressly discuss the three elements comprising the common law test under *Sarabia* for whether the burden of proof shifted to Chamberlain. This is a thin reed on which to allege error, and we find no merit in it for two reasons.

First, we presume the trial court followed the applicable law and that its judgment is correct. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.) This is particularly true here since the court correctly recognized that "a presumption of undue influence occurs when there is a concurrence of ALL of the required elements," which tracks the language of the common law rule as stated in *Sarabia*. (*Sarabia*, *supra*, 221 Cal.App.3d at p. 605.) Moreover, the court expressly cited *Sarabia* and summarized its rule accurately, i.e., "If the court finds evidence to support the presumption of undue influence, the burden of proof shifts to the respondent to provide evidence to rebut the presumption." (*Sarabia,* at p. 605.)

The fact that the court did not discuss each of the *Sarabia* factors is of no legal significance. "The trial court is not required to make an express finding of fact on

14

every factual matter controverted at trial, where the statement of decision sufficiently disposes of all the basic issues in the case." (*Bauer v. Bauer* (1996) 46 Cal.App.4th 1106, 1118 (*Bauer*).) The core issue in this case was whether, as Swanner claimed, Chamberlain exercised undue influence over Runnells; the court's lengthy statement of decision makes clear it concluded the answer was "No." That is all that was required. (*Hellman v. La Cumbre Golf & Country Club* (1992) 6 Cal.App.4th 1224, 1230 (*Hellman*) [trial court's statement of decision is required only to state ultimate rather than evidentiary facts].)

Second, Swanner fails to demonstrate prejudicial error. "No judgment, decision, or decree shall be reversed . . . unless it shall appear from the record that . . . a different result would have been probable if such [alleged] error . . . had not occurred . . . ." (Code Civ. Proc., § 475.) "[T]he burden to demonstrate prejudice is on the appellant." (*Freeman v. Sullivant* (2011) 192 Cal.App.4th 523, 528.)

Swanner does not meet this fundamental appellate obligation. Nothing suggests the trial court's decision was a close call. Nothing suggests the court would have found in Swanner's favor if only the court had concluded *Sarabia*'s three elements were satisfied, and the burden of proof therefore rested on Chamberlain.

Swanner fails to demonstrate prejudice because even when the burden of proof shifts, the question of undue influence remains a factual question. Under either the common law test set forth in *Sarabia* or the statutory test set forth in section 15610.70, the question of whether the presumptions in favor of or against a testamentary instrument apply in a given case are factual questions to be resolved by the fact finder. (*David v. Hermann* (2005) 129 Cal.App.4th 672, 684-685.) Thus, even when a presumption of undue influence arises, it remains the trier of fact's prerogative to conclude that the subject's will was not overborne, but rather his or her testamentary gift was a voluntary and deliberate act. (*In re Marriage of Mathews* (2005) 133 Cal.App.4th 624, 631-632 (*IRMO Mathews*).) Put another way, the presumption of undue influence, if established,

15

still "may be overcome where it is manifest that the grantor acted voluntarily and with full understanding, and that the benevolent act was engendered in the testator's own mind without overreaching or improper importunity on the part of the grantee." (*Camperi v. Chiechi* (1955) 134 Cal.App.2d 485, 504 (*Camperi*).)

That is what the trial court concluded here. The evidence recited in the SOD makes clear that Runnells had long questioned her son's financial dealings and, in any event, she felt she had favored Thomas unequally over Raelene and Carol by making multiple income property acquisitions possible for him. While Runnells may have provided for Raelene outside the trust, the court could reasonably conclude that choosing to do so the same for Carol through the trust was not the result of undue influence.

In any event, the Court of Appeal in *Sarabia* explained that a quantitative assessment of testamentary distributions does not prove undue influence. "For the trier of fact to decide what influence was 'undue' clearly entails a qualitative assessment of the relationship between the decedent and the beneficiary. . . ." (*Sarabia*, *supra*, 221 Cal.App.3d at p. 607.) Under both the common law and statutory law, "The trier of fact derives from the evidence introduced an appreciation of the respective relative standings of the beneficiary and the contestant to the decedent in order that the trier of fact can determine which party would be the more obvious object of the decedent's testamentary disposition." (*Ibid.*; see § 15610.70, subd. (b) [evidence of unequal distribution is "not sufficient to prove undue influence"].)

Ultimately, the court concluded Runnells was a strong-willed individual whose will was not overborne. Swanner avoids couching his claim as a substantial evidence challenge, but phrasing it as legal error does not aid him where he fails to show any reasonable probability of a difference in the court's ultimate determination. Any shifting back and forth of presumptions would have made no difference. The SOD makes clear that Runnells was the type of person who did what she intended to do; those who knew her noticed little or no change in her mental acuity even as she lived into her

16

nineties. Thus, even if a presumption of undue influence arose, substantial evidence supported the trial court's conclusion the presumption was rebutted and Runnells's trust distributions were not the result of undue influence.

Swanner's related claims of error fare no better. He contends the probate court failed to consider all the relevant factors in assessing undue influence under section 15610.70 and, further, that the court could not reasonably conclude based on substantial evidence that Runnells was not at risk of undue influence. On the latter contention, Swanner emphasizes the testimony of "three qualified witnesses." He implies these were the only three qualified witnesses on the subject of victim vulnerability— "Chamberlain's expert neurologist, Swanner's expert neuropsychologist, and Runnells'[s] treating physician," each of whom "uniformly said that Runnells was *susceptible* to undue influence" based on factors such as her age, etc. (Italics added, boldface omitted.)

This argument is flawed. It was for the trial court, as the trier of fact on the question of undue influence, to evaluate all of the evidence. Its SOD indicates the court did so. Individuals who regularly interacted with Runnells gave compelling testimony that her mental state remained strong. Their testimony also supported the conclusion that Runnells continued throughout her life to be as strong-willed as ever, inoculating her against anyone's undue influence.

The question was whether Runnells made the contested changes to her estate plan as a result of undue influence. (*David v. Hermann*, *supra*, 129 Cal.App.4th at pp. 684-685; *Camperi*, *supra*, 134 Cal.App.2d at p. 504; accord, *IRMO Mathews*, *supra*, 133 Cal.App.4th at pp. 631-632.) We read the trial court's conclusion in its SOD that Runnells was not ultimately vulnerable to undue influence to mean simply that Swanner's challenge based on undue influence claim failed. That was the court's decision to make.

Swanner's contention based on the court's alleged failure to consider the undue influence factors listed in section 15610.70 rests in the statute's exhaustive detail

17

regarding those factors. For example, section 15610.70, subdivision (a)(1), lists all the following as subfactors potentially bearing on a person's vulnerability to undue influence: "Evidence of vulnerability may include, but is not limited to, incapacity, illness, disability, injury, age, education, impaired cognitive function, emotional distress, isolation, or dependency, and whether the influencer knew or should have known of the alleged victim's vulnerability."

Besides victim vulnerability, the statute lists subfactors bearing on the trier of fact's consideration of the three other enumerated factors for undue influence— namely, the alleged influencer's apparent authority, the alleged influencer's "actions or tactics," and the equity of the result. (§ 15610.70, subd. (a).) Swanner infers that because the trial court did not detail in the SOD its consideration of each of these factors and their subfactors, the court did not consider them. But, as Swanner acknowledges, the court responded to his objections in its SOD, albeit in his view only by "scratching the surface on the elements but not doing the full analysis of all of the factors."

The trial court is not required to respond point by point to issues posed in a request for a statement of decision. (*In re Marriage of Burkle, supra,* 139 Cal.App.4th at p. 736, fn. 15.) A statement of decision is sufficient if it "fairly discloses the determinations as to the ultimate facts and material issues in the case." (*Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 513; *Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1380.)

In the end, it is apparent that Swanner disagrees with the trial court's conclusion that Runnells's testamentary dispositions were not the result of undue influence. That the court did not expressly discuss any particular factor, subfactor, or evidence that *Swanner* found particularly persuasive in *his* favor does not establish legal error. The court wrote an exhaustive, 35-page SOD setting out the evidence bearing on the question of undue influence, while highlighting evidence and testimony the court found particularly persuasive. The court concluded on the factual question before it that

18

Runnells's testamentary dispositions were not the result of undue influence. No more was required. (*Bauer*, *supra*, 46 Cal.App.4th at p. 1118; *Hellman*, *supra*, 6 Cal.App.4th at p. 1230.)

Swanner's challenge to the court's ruling excluding a neuropsychologist's report does not change our analysis. In 2016 or 2017, in response to one of Swanner's conservatorship petitions, Runnells's attorney had her examined by a neuropsychologist, who prepared a report, which the attorney gave to Chamberlain to deliver to Runnells in her assisted living home. There was no evidence Chamberlain read the report. Nevertheless, Swanner contends that using Chamberlain as an intermediary in this manner waived the attorney-client privilege he concedes attached to the report. We disagree.

The attorney-client privilege applies to "communications made by the client or the attorney to [an] expert in order for the expert to properly advise counsel." (*DeLuca v. State Fish Co., Inc.* (2013) 217 Cal.App.4th 671, 688.) The privilege extends to reports prepared by the expert as, in effect, an agent of the attorney. (*People v. Gurule* (2002) 28 Cal.4th 557, 594.)

"Whether a party has waived a privilege . . . is often a mixed question of fact and law." (*Behunin v. Superior Court* (2017) 9 Cal.App.5th 833, 843.) "'Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied.'" (*McKesson HBOC, Inc. v. Superior Court* (2004) 115 Cal.App.4th 1229, 1235-1236.) Where historical facts are undisputed, the question is whether, given those historical facts, the holder of the privilege has waived it. (See *McKesson*, at p. 1236.) The "inquiry 'requires a critical consideration, in a factual context, of legal principles and their underlying values'" and thus it is "predominately legal, and we independently review the trial court's decision." (*Ibid.*)

19

We find no error. It is undisputed that Chamberlain had sole power of attorney regarding Runnells's medical affairs, Runnells resided in an assisted living home, Chamberlain regularly visited her there, and Runnells instructed the home Swanner was not to visit her, but Chamberlain was welcome. In these circumstances, we see nothing indicating any intent on the part of Runnells or her attorney to waive the confidentiality of their communications. Entrusted with power of attorney regarding any medical issues Runnells might face, including those that might or might not be disclosed in such a report, Chamberlain could reasonably be entrusted to keep such communications confidential. In effect, Chamberlain was an agent of the attorney no less than the expert, and no less than a courier entrusted to deliver the expert's report to Runnells. We see no rule of law or policy that would be fostered by finding any waiver in these circumstances.

## DISPOSITION

The judgment is affirmed. Chamberlain is entitled to her costs on appeal.

GOETHALS, ACTING P. J.

WE CONCUR:

MOTOIKE, J.

DELANEY, J.

20